**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROSE HARRIS,<br><br>                     PLAINTIFF,<br><br>          V.<br><br>THE NATIONAL HOCKEY LEAGUE,<br>NHL ENTERPRISES, LP,<br>ANAHEIM DUCKS HOCKEY CLUB LLC,<br>OC SPORTS & ENTERTAINMENT LLC,<br>PATRICE DISTLER IN HER PERSONAL AND<br>PROFESSIONAL CAPACITIES,<br>MARNI BOBICH IN HER PERSONAL AND<br>PROFESSIONAL CAPACITIES, AND<br>DOES 1–10,<br><br>                     DEFENDANTS. | **AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Rose Harris, represented by Seppinni Law, alleges based on information and belief at all relevant times:

## **INTRODUCTION**

1.     When a young woman exposed sexual harassment at the Anaheim Ducks, NHL executives conspired to crush her dreams of working in professional hockey.

2.     In July 2022, the Anaheim Ducks[1] hired Rose Harris as an IT Coordinator—a dream come true for Harris who is passionate about professional hockey. She excelled and was well-liked by her colleagues; so much so that the Ducks promoted her.

3.     But throughout her time with the Ducks, OCSE, and the NHL, Harris witnessed and experienced repeated and unchecked sexual harassment, bullying, and discrimination. This included nonconsensual, sexualized touching; near-constant vulgar, sexist, and

---

[1] OC Sports & Entertainment LLC (OCSE) is the Anaheim Ducks Hockey Club LLC's (Anaheim Ducks or Ducks) parent company.

derogatory comments, including homophobic slurs, discriminatory remarks about sex, women, and LGBTQ+ people; obscene pornography on a colleague's work computer; and disturbing comments about how Harris and other employees dressed, including that women dressed like "whores."

4.      Harris was repeatedly forced to hear about her colleagues' alleged sexual relationships and was harassed with increasingly invasive questions about her own sex life and sexuality.

5.      Harris's colleagues also repeatedly spread vicious lies about her. As just a couple of examples: one colleague lied and said he had seen her naked (he hadn't) and that they had had sex (they hadn't); another lied and told her coworkers that Harris and he were having sex (they weren't).

6.      Defendants also routinely denied Harris entry to areas for which she had credentials, made her wait to access certain work facilities until she could be accompanied by a man, and at times did not allow her to begin her work—work she was hired and qualified to do—until she had the "okay" from a male supervisor.

7.      At first, Harris did not report this harassment and discrimination because she feared retaliation. But when Harris's colleague Katherine Pearson named Harris as a witness and fellow victim in an arbitration proceeding over the sexual harassment Pearson experienced as an Anaheim Ducks and OCSE employee, OCSE and the Ducks demanded Harris testify without counsel about what she had seen and experienced. Over several meetings with HR, Harris reported the sexual harassment and discrimination she'd experienced. HR told Harris that what had happened was "not okay" and "would be dealt with."

8. Still—despite concluding it "more likely than not" that "some of the Company's policies were violated by one or more employees," HR did nothing to meaningfully address the harassment or discipline the harassers. Indeed, rather than punish Harris's most frequent harasser—who repeatedly touched Harris without her consent and made frequent sexist and derogatory comments to and about her—**the Anaheim Ducks and OCSE promoted him to full-time staff *after* finding that he'd sexually harassed Harris.**

9. The Ducks and OCSE's harassment and discrimination toward Harris continued. And, just as she had feared, Harris also experienced retaliation. This included greatly increased workload, with trainings, meetings, and assignments all beyond her regular scope of duties, and all while her title and compensation remained the same. After she was named as a witness and victim of sexual harassment, Ducks HR told Harris that if she wanted to advance, she needed to look elsewhere.

10. Desperate to escape this harassment and retaliation, and with the Ducks and OCSE promoting one of her harassers rather than taking remedial action, Harris had no choice but to resign.

11. She found a new job with the National Hockey League[2] and moved across the country to start work in New York City. Harris was excited to still be working within the world of professional sports and looked forward to a fresh start with the NHL.

12. But once word spread that she'd been hired by the NHL, OCSE and the Ducks outed her as a sexual harassment victim and an adverse witness in a legal proceeding against a league franchise. They communicated this to the NHL's seniormost HR

---

[2] (NHL)

executive, Patrice Distler. The NHL, via Distler, made plans to oust Harris from her new role at the NHL for acting as a witness in a legal proceeding and for being a victim of sexual harassment.

13.    The NHL and Distler wanted Harris gone but they had no legitimate reason to fire her. So, top NHL executives went about manufacturing one. The NHL assigned Harris, who worked there as an IT staffer, work on an IT ticket to fix an ostensible issue with the email address for Patrice Distler, Chief HR Officer for the NHL.

14.    Soon after, Distler falsely accused Harris of hacking her emails—a crime—and fired her on the spot.

15.    The NHL never produced *any* evidence supporting Patrice Distler's knowingly false accusation, despite Harris's repeated requests for activity logs. **Indeed, the NHL's EEOC Position Statement filed under penalty of perjury does not include any evidence supporting Distler's malicious, false accusation, despite containing over 30 pages of evidentiary exhibits.**

16.    Instead, Distler, the NHL's highest ranking HR executive, had Harris's work devices mailed directly to herself.

17.    On January 30, 2025, Plaintiff's counsel sent the NHL a document preservation notice asking that it confirm that potential evidence was being preserved and not destroyed.

18.     The NHL never responded.

19.    After the NHL and Distler fired Harris, they continued colluding with OCSE and the Ducks to blacklist Harris from pursuing her career in professional sports by interfering with a job opportunity in Brooklyn and preventing her from being rehired by the Ducks in California.

## THE PARTIES

20. Plaintiff Rose Harris worked for Defendants Anaheim Ducks Hockey Club LLC and OC Sports & Entertainment LLC from July 2022 to December 2024, and she worked for Defendant the National Hockey League and NHL Enterprises, LP, from January 7, 2025, to January 30, 2025. At all relevant times, she was an "employee" within all applicable statutes.

21. Defendant the National Hockey League is a professional ice hockey league, with teams in the United States and Canada. Its headquarters are at One Manhattan West, 395 9th Avenue, New York, NY 10001.

22. Defendant NHL Enterprises, LP, is an NHL subsidiary listed on Harris's paystubs. Its headquarters are at One Manhattan West, 395 9th Avenue, New York, NY 10001.

23. Defendant Anaheim Ducks Hockey Club LLC is a professional ice hockey franchise within the NHL. Its headquarters are at 2695 E Katella Avenue, Anaheim, CA 92806.

24. Defendant OC Sports & Entertainment LLC is the parent company for the Anaheim Ducks. Its headquarters are also at 2695 E Katella Avenue, Anaheim, CA 92806.

25. Defendant Patrice Distler is Senior Vice President and Chief Human Resources Officer at the NHL.

26. Defendant Marni Bobich is Senior Vice President of Human Resources for the Ducks.

27. Defendants Does 1–10 are individuals or entities whose names or identities are not ascertainable at the time of this filing.

28.     At all relevant times, the NHL, NHL Enterprises, LP, the Anaheim Ducks, OCSE, Patrice Distler, Marni Bobich, and Does 1–10 were Harris's "employers" under all applicable statutes.[3]

---

[3] Any references to "the NHL" include "NHL Enterprises, LP," and any references to "the Ducks" include "OCSE," and vice versa.

## JURISDICTION AND VENUE

29.    The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions on the deprivation of Harris's rights under federal law.

30.    The Court has supplemental subject matter jurisdiction over Harris's related state and local law claims under 28 U.S.C. § 1367(a).

31.    Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in the Southern District of New York, where Harris worked for the NHL. The NHL also engages in regular and continuous contacts with this District by employing individuals, including Harris, to work and do business at its headquarters in this District. The Ducks and OCSE engaged in regular contact with the District, including by participating in an anticompetitive and blacklisting scheme in this District, furthered through frequent communications about Plaintiff with NHL employees in this District.

## ADMINISTRATIVE PROCEDURES

32.    Under section 8-502 of the New York City Human Rights Law[4], Harris served a copy of the Complaint on the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within 10 days of its filing, thereby satisfying the notice requirements of these New York City local law causes of action.

33.    Harris timely filed a charge of discrimination with the Equal Employment Opportunity Commission[5] and received Notices of the Right to Sue on February 13, 2026. Harris amended this lawsuit within 90 days of receiving the EEOC Notices.

34.    Harris timely filed a charge of discrimination and received a Notice of the Right to Sue from California's Civil Rights Department before bringing this action, thereby satisfying the notice requirements of the California state law causes of action.

35.    Harris served a copy of the Complaint on the New York Attorney General in compliance with the notice requirements of NY GBL § 340.

---

[4] (NYCHRL)
[5] (EEOC)

## FACTS

**I.  Harris experiences, witnesses, and reports pervasive sexual harassment within the Anaheim Ducks and OCSE, then is retaliated against.**

36.    In July 2022, the Anaheim Ducks and OC Sports & Entertainment hired Harris as an IT Coordinator. Harris carried Ducks a "staff credential" and regularly worked with Ducks players, coaches, and equipment managers in the Ducks arena and facilities.

37.    The Duck's issued Harris's staff credential "for use solely in connection with [her] working function on behalf of the Anaheim Ducks."




38.    Harris reported to and regularly worked and communicated with both Ducks and OCSE employees in her day-to-day; the Ducks controlled Harris's access to and use of Ducks facilities; and Ducks HR VP Marni Bobich oversaw the HR investigation into the sexual harassment Harris witnessed and experienced while working for the Ducks and

OCSE. Ducks HR, via Bobich, also caused Harris's termination by telling her that if she wanted to advance in her career she should leave the Ducks and OCSE.

39.     Harris excelled in her work. Her colleagues, direct reports, and supervisors enjoyed working with her. She never received a bad performance review and the Ducks and OCSE promoted her to IT Analyst.

**A. Harris is relentlessly sexually harassed and discriminated against by Anaheim Ducks and OCSE employees and coaches.**

40.     Harris experienced sexual harassment with the Ducks throughout her two-and-a-half years working there, including in the Ducks' 2022–2023, 2023–2024, and 2024–2025 seasons; and after working there, when the Ducks continued taking sexual harassment-related adverse actions against her through at least January 24, 2025.

41.     For example, Nick Aguilera, then on the OCSE Public Relations team, continually sexually harassed Harris, including by repeated nonconsensual touching and sexist, vulgar, and derogatory comments and jokes, to and about Harris. He repeatedly shared with Harris details about their co-workers' sexual relationships, including Ducks players and staff. In one instance, at an event with colleagues at a local bar, in front of their co-workers, after Aguilera's touching had grown particularly frequent, Harris asked him to stop and told him it made her uncomfortable. He stormed out of the bar and did not return.

42.     Because of Aguilera's repeated touching and other sexual harassment, members of the Public Relations team often joked that Aguilera and Harris were a "couple" and would get married.

43.     Aguilera took this further, lying to their co-workers that he and Harris were in a sexual relationship, and made sexual and other derogatory comments about her to them.

Harris experienced this harassment—from Aguilera and other members of the Public Relations team—throughout the 2022–2023 season and beyond.

44.    Harris also experienced frequent sexual harassment and bullying by the Ducks' equipment managers. After each game, Harris was tasked with storing the Ducks' networking equipment that press used to upload game photos. The press worked in the Ducks' photography room, which was across from the equipment managers' laundry room. As a result, Harris spent game and post-game hours in close quarters with the Ducks' equipment managers.

45.    As the season progressed, the Ducks' equipment managers declared Harris "one of the boys." At the start of the season, they mostly spoke with her only about hockey and their work, but as the season progressed, they subjected Harris to conversations involving homophobic slurs; vulgar, discriminatory, and derogatory comments about sex, women, and LGBTQ people; and the intimate details of their own sexual relationships. They also repeatedly pushed her to share about her own sexual relationships and sexual history, demanding she answer increasingly invasive questions. When Harris tried to rebuff their comments or redirect the conversations, the equipment managers mocked and demeaned her. Harris felt trapped by these conversations, which left her feeling humiliated and deeply uncomfortable.

46.    One of the equipment managers, Eric Philips, spread sexual and other lies about Harris, telling OCSE and Ducks employees—including other equipment managers and members of the Public Relations teams—that when he and Harris attended college together, he had seen her naked and they had had sex. Neither of these things happened. Harris heard

about this—on several occasions—from Aguilera and from other Anaheim Ducks equipment managers.

47.    Throughout Harris's employment, Harris's supervisors and co-workers also made harassing and sexist comments to her and to other women employees, including an intern, about their clothing. At one point, although Harris was dressed according to the dress code, her supervisor asked her whether she was "planning on changing" before a game and suggested she looked provocative and unprofessional.

48.    In another Ducks department, an intern repeatedly was told by the department head and her co-workers that she wasn't dressed appropriately and **that she was "dressed like a whore."** Because of this ongoing sexual harassment, the intern moved to a different department as soon as there was an opening. Harris encouraged her to report the comments to Ducks HR, but the intern told Harris she too was afraid that she would face retaliation, including job loss. Harris never heard Ducks supervisors or department heads make similar comments about men's clothing.

49.    Once, as Harris was fixing a browser issue for a member of the Ducks' hockey operations staff—on his work device—she stumbled upon a pornography website saved on his work browser, including a **link to "BBC and grandma porn"** in the description, which auto-populated while Harris was trying to navigate to another website. Harris continued working but was shaken by what she saw.

50.    This was part of the frat house boys club environment the Anaheim Ducks and OCSE fostered in the workplace. In addition to these incidents, women, including Harris were often stymied and sidelined.

51.     In her work for OCSE and the Ducks, Harris provided IT support not only for the Ducks, but also for any events or tours at OCSE's Honda Center, including WWE and MMA fights. During one of these fights, in February 2024, Harris responded to a call for assistance with an IT network question. When she arrived at the truck bay (where the Center's network switches are housed) and identified both the problem and the solution, the event staff refused to believe her or let her begin work and instead turned to her male boss. Harris's boss assured them she was right, but they would not let her begin work without his go-ahead. Harris realized the event staff at OCSE didn't trust her because she was a woman.

52.     Harris and her co-worker Katherine Pearson had season-specific Ducks-issued credentials to enter team and player facilities, including locker rooms. Yet Ducks and OCSE management denied Harris and Pearson access to these workplace facilities. Harris and Pearson were told to wait for a man to "give them permission" to enter. Their male co-workers—despite having the same access credentials as Harris and Pearson—never had to wait for permission and could enter these facilities. At one point, one of the Ducks coaches told Pearson she shouldn't walk down the players' halls without permission, as she might be "uncomfortable" with what she saw or heard.

53.     Like Harris, Pearson experienced repeated sexual harassment throughout her time with OCSE, and ultimately was forced to quit.

**B.     Harris is named as a witness in a proceeding about the sexual harassment that other women suffered within the NHL's Anaheim Ducks.**

54.     On June 2, 2023, Francis Lam, OCSE and Anaheim Ducks Vice President and Deputy General Counsel, and Francis Hernandez, OCSE's external legal counsel, called Harris into a closed-door meeting. In this meeting, Harris learned Pearson had reported the

harassment and other misconduct she'd experienced. Pearson had named Harris as a witness and as someone who also was a victim of sexual harassment, according to Lam and Hernandez.

55.     In the June 2 meeting, Harris told Lam and Hernandez that she had not reported the sexual harassment out of fear of retaliation, including job loss, and blacklisting in the hockey operations space, where she was eager to build her career.

56.     Throughout summer and fall of 2023, Ducks and OCSE HR (which were one and the same) interviewed Harris. Harris shared the details of the sexual harassment she experienced in several meetings, including with HR representatives Leonor Romero and Jordan Fisher, who told her what she experienced was "not okay" and "would be dealt with."

57.     But, on October 19, 2023, when Harris met with Ducks and OCSE HR VP Marni Bobich to discuss the sexual harassment she and others experienced, **Marni Bobich told Harris: "If you want to further your career within hockey operations, you should consider looking elsewhere."**

58.     Later that month, on October 27, 2023, Bobich closed the investigation and sent Harris a two-and-a-half-page letter "summariz[ing] the allegation, the results of the investigation, and . . . any actions the Company will be taking to address the matter."

59.     But Bobich's letter contained several errors.

60.     Despite concluding it "more likely than not that some of the Company's policies were violated by one or more employees," the letter was vague about what, if any, discipline those employees might face beyond "coachings and trainings," which all OCSE (indeed, all California) employees must already undergo.

14

61.     Bobich's letter also dismissed the concerns Harris raised during her interview about being passed over for a promotion to Data Architect, and about her compensation relative to men at the Ducks.

62.     Harris emailed Bobich the next day to correct the errors in Defendants' letter. Harris set out in writing details that the letter omitted.

63.     As an example, the Ducks and OCSE wrongly concluded that the sexual harassment Harris experienced throughout her time working with the equipment managers happened when she was "off the clock." Not so. As Harris wrote, she was "on the clock," working, throughout nearly all the harassment she experienced and, more important, the equipment managers were "always" on the clock when they harassed her.

64.     Harris also addressed HR's vague assurances that OCSE "ha[d] taken steps to address any behavior that was found to have violated Company policies, and to ensure that they are not repeated." Harris wrote that with respect to Aguilera's repeated harassment, Lam and Hernandez told her there was little HR could do, as Aguilera was an intern and, at the time of the investigation, his internship had ended. But by the time the investigation was closed, **the Ducks and OCSE had hired Aguilera full-time**. In other words, in the time Harris reported Aguilera's repeated sexual harassment, and while HR claimed it was investigating, Aguilera applied for and was given full-time employment at OCSE. According to Lam and Hernandez, Aguilera faced no discipline at all. Instead, OCSE and the Ducks ratified his misconduct by hiring him fulltime despite also corroborating Harris's allegations of misconduct against him.

65.     Bobich did not respond to Harris.

66. After the investigation concluded, the harassment and discrimination continued throughout 2023 and 2024, and Harris began to experience increasing retaliation for her reports.

67. Harris desperately wanted the harassment to end. She was finding it increasingly difficult to come to work each day. After HR concluded its investigation, she had no reasonable hope that OCSE or the Ducks would do anything meaningful to stop the harassment or hold her harassers accountable—especially considering Bobich told her that she had no future within the Ducks.

68. In late 2023 and through all of 2024, OCSE and the Ducks increased Harris's workload in response to her protected complaints about sexual harassment. Defendants assigned her more work and responsibilities than her peers in the same role. Despite this, her title and compensation remained unchanged.

69. The Ducks and OCSE made Harris undergo additional trainings and complete work for members of the "business applications" team, all outside the scope of her regular duties. As part of her work with ServiceNow, she had to interact regularly with a new IT VP, Blaine Ung, who routinely bullied and was hostile toward Harris, her co-worker Gloria Park, and other women IT members, all of which the Ducks and OCSE knew about.

70. Desperate to escape the near-constant harassment and frequent unwanted sexual touching, with no indication that the Ducks and OCSE would ever do anything meaningful to stop it, and because Bobich had told her to "look[] elsewhere" for work, Harris began to apply for other jobs in professional hockey.

71. In late November 2024, Harris received an offer for the SaaS Technologies Manager position at the NHL. The NHL's recruiting manager, James Minger, told Harris

she would likely be able to start work remotely, so that she could get settled before relocating to New York. But after she signed the offer letter, she learned she would have to start in person, immediately.

72.    On November 26, 2024, Harris resigned from OCSE and the Ducks. Her last day was December 20, 2024.

73.    In her exit interview with Ducks and OCSE HR's Jordan Fisher, Fisher told Harris she was "re-hirable," if she ever wanted to return to the Ducks and OCSE.

**II. Patrice Distler, the NHL's head of HR, learns of Harris's whistleblowing at the Ducks then falsely accuses her of hacking her email, in a pretext meant to punish Harris for reporting sexual harassment within the NHL, then fires her.**

74.     On January 7, 2025, Harris began work at the NHL in the league's New York City headquarters.

75.     On January 10, 2025, Harris was assigned work on a ServiceNow ticket for Patrice Distler. Distler, or someone on her behalf reported that an Outlook user e-mailing with Distler had reported an extra space in Distler's Outlook display name.

76.     To help resolve the ticket, and as she had been instructed to do in her training with Director of SaaS Operations Eugene Schaffmeir, Harris accessed Distler's Outlook mailbox using temporary delegate access—access which Schaffmeir granted to her when he assigned her work on the ticket, and which was limited to that ticket. Harris's temporary delegate access to Distler's email was used to check her display name settings within Outlook, to see whether there was a typo causing the extra space.

77.     As Harris worked on the ticket, she communicated via email and on Zoom and Slack calls with Schaffmeir and Technical Support Coordinator Jon LaCovara. They all agreed there was no extra space in Distler's Outlook settings (nor was there an extra space in the global Outlook Address Book or the Active Directory).

78.     Once Harris confirmed Distler's Outlook settings listed the correct name (no extra space), Harris ended her delegate access.

79.     She, Schaffmeir, and LaCovara reasoned the extra space, to the extent one existed, likely was in the other user's account (the user who had allegedly reported seeing the typo), and that user would need to check and correct Distler's contact information within their own Outlook address book.

18

80.    Harris had no other involvement with the ticket, which she understands was closed out that day or soon after.

81.    Harris never opened or read Distler's emails.

82.    On January 23, Distler (the senior-most HR executive at the NHL) called Harris (a junior IT staffer) on her personal cellphone. When Harris didn't pick up—it was an unknown number—Distler left her a voicemail. Harris immediately called Distler back.

83.    On that call (which included NHL Senior Vice President attorney Katherine Watson), Distler told Harris SecOps had recently done an audit of delegate access within the NHL. Distler said that Harris had accessed Distler's inbox around 6:30PM, after hours (she did not say on which day), and that because Harris had no "business reason" to have access to her email and because she was on a probationary period with the company, the NHL was terminating her employment effective immediately.

84.    This was false. Harris *did* have a "business reason," the IT ticket that she'd been assigned to work on.

85.    Harris was shocked and distraught. She denied Distler's false accusation, said she never used her work computer after hours, and certainly never had accessed anyone's inbox after hours, let alone Distler's. Harris explained she only ever accessed other inboxes during working hours and as part of her work on the ServiceNow tickets she was assigned.

86.    Watson told Harris that because she denied the accusation, the NHL would place her on paid administrative leave, and the NHL would open an investigation. Watson then told Harris not to use her work computer or cellphone, not to reach out to her boss or any other employees within the NHL, and not to investigate ServiceNow to see whether there was a ticket for Distler.

19

87.    Harris was completely blindsided and upon reflection overnight wondered if the call she received the day before was a prank or a hoax. So on January 24, Harris went into the office, to see whether the call had been a scam or was otherwise illegitimate, as it originated from an unknown number to Harris's personal cell; and Harris did not personally know (and had never met) Distler.

88.    When she tried to badge into the lobby, her badge did not work. She asked the front desk for a temporary one, which they gave her, and went up to the 27th floor. At the NHL reception desk, she asked to speak to Distler. The receptionist led Harris down the hall to Distler, who was with NHL attorney Julie Grand.

89.    Harris introduced herself and asked Distler whether she had called her the day before. Distler confirmed she was the one who called Harris. She then asked Harris to leave the building.

90.    Harris complied and asked if Distler would email her about what was happening, so that she could have some written record of this. Distler said she would but did not. Harris left the building.

91.    Harris returned home and saw that she had missed a call from Distler at 10:49am. Distler emailed her 10 minutes later, telling her to return the call.

92.    Harris called her back. This time, NHL attorney Julie Grand was on the phone with Distler. Now Distler's story changed. Rather than accusing Harris of accessing her inbox around 6:30pm, after hours with no date mentioned, Distler now accused Harris of accessing her inbox around 12:30pm on Friday, January 10, not in connection to a service ticket.

93.    Harris asked why the time had changed. Distler said it was because of a "misreading of the time zone in the SecOps report," but this made no sense.

94.    Distler then read aloud what she said was a written statement:

> During a SecOps query into recent email delegations of all users, it was discovered that on January 10, 2025, at around 12:30pm, you delegated yourself access to my outlook account. During the time you were in my account, 11 email items were accessed. You did not have permission nor a business purpose for accessing my account, which is a multi-step process. This unauthorized access to my email is a serious violation of our policies. Given your role and access at the organization, we have no choice but to terminate your employment, effective immediately.

95.    Harris asked about what, if any, evidence they had to support these claims. They said they would not share it.

96.    Distler's written statement did not state that *Harris* had accessed 11 email items; rather, simply that "11 email items were accessed." Distler and the NHL knew that Distler or another employee, not Harris, accessed the 11 items in question.

97.     Shortly after the call, Harris received an email from Distler with the same statement she had read aloud; an email with offboarding information; and an email from Andy Crawford, from the Office of Services & Facilities, with a FedEx label, asking Harris to mail her equipment back to Distler.



98.     Harris thought it odd that the NHL's seniormost HR executive, the same person who accused, "investigated," and fired her would also be taking delivery of her equipment personally, which is not the standard protocol for departing employees from the NHL, an organization with thousands of employees.

99.     That afternoon, Harris emailed Distler, Watson, Schaffmeir, and Jim Tate (Senior Director of Support Services) to explain that the Distler ServiceNow ticket she'd

been assigned was the reason she had delegate access to Distler's inbox on January 10 at 12:30, and to explain what she did while she had delegate access.

100.    She wrote that she did not open or read any of Distler's emails and asked that they conduct a more thorough investigation. She then called Schaffmeir, who had worked with her on the ticket. But Schaffmeir did not answer.

101.    On January 30, 2025, Distler responded to Harris's email: "We conducted a further investigation and stand by our original decision to terminate your employment."

102.    Patrice Distler and the NHL refused to provide Harris with any evidence supporting their decision to fire her. They manufactured a lie as pretext to fire her because she reported and blew the whistle on sexual harassment she witnessed and experienced while working for an NHL franchise.

103.    When Harris applied for unemployment benefits, her application was at first denied because the NHL misrepresented in further retaliation that she was fired due to a "misconduct violation."

104.    Defendants knew this was false.

105.    Harris appealed.

106.    Harris's unemployment benefits appeal hearing was on May 23. The NHL still did not submit any evidence against Harris in support of their misconduct allegations against her.

107.    Harris won her appeal and was granted unemployment benefits.

**III.    OCSE, the Ducks, and the NHL collude to blacklist, defame, and retaliate against Harris.**

108.    After the NHL fired Harris, she spent over five months applying to jobs in professional sports, including at Brooklyn Sports & Entertainment, LLC (BSE), owner of the Barclays Center, the New York Liberty, and the Brooklyn Nets.

109.    After going through several rounds of interviews, Harris learned she was one of two candidates still in the running for the role.

110.    On April 11, the BSE recruiter Harris had been working with called Harris to tell her she had "heard through the grapevine" about the NHL.

111.    Ten days later, the BSE recruiter told Harris she was not selected.

112.    In May, Harris contacted her former OCSE supervisors, to ask whether her old position was still available and if she could apply. She cc'd Jordan Fisher, who'd conducted her exit interview and who told her she was eligible for rehire.

113.    Fisher responded, telling Harris no.

114.    In late May, Harris returned to California to visit friends and her former OCSE and Ducks co-workers. While at OCSE, she stopped by the IT building, where her former boss, CJ Leeman, welcomed her and introduced her to the new Senior Director of IT Operations.

115.    While in the IT building, Harris ran into a receptionist from another office, who encouraged her to stop by her desk to see a few more of her former colleagues before leaving. Harris followed the receptionist, who brought her to the reception area and then to the cubicles. While among the cubicles, Harris chatted with some of her former colleagues, all of whom were happy to see her.

116. Fisher, from Ducks HR, then came up to Harris and told her she couldn't be in the cubicle area without an escort and had to leave the building. Harris complied but noted to Fisher that she *did* have an escort—the front desk receptionist had invited her to the cubicles. Fisher then said it was "against company policy" for Harris to be there and told her to leave immediately.

117. When Harris had worked at OCSE, former employees frequently visited the cubicles and offices without escorts. She'd never heard of the "company policy" prohibiting this, and if there was such a policy, she never saw it enforced.

118. Separately, Harris's previous manager told Harris that he'd love to rehire her, but that OCSE and the franchise had to secure the NHL's permission before hiring a current or former NHL employee.

119. After months of delays and excuses things became clear: the NHL had put the kibosh on Harris's re-employment prospects with the Anaheim Ducks.

120. Harris, a victim of sexual harassment and retaliation, ultimately accepted a job in Utah for a third of her NHL salary.

121. Harris now brings this lawsuit to hold the NHL, Anaheim Ducks, SVP of HR Patrice Distler, and Ducks HR Executive Marni Bobich accountable for their mistreatment of her and other women within the league.

## FIRST CAUSE OF ACTION
### Discrimination and Sexual Harassment
### in Violation of the New York City Human Rights Law
### (Against NHL, NHL Enterprises, LP, Patrice Distler, and Does 1–10)

122.   Harris incorporates the prior paragraphs.

123.   At all relevant times, Harris was an "employee" and Defendants were "employers" within the meaning of the NYCHRL, NYC Admin. Code § 8-107.

124.   Defendants discriminated against Harris based on her gender by treating her less well than other employees. Defendants subjected Harris to a hostile work environment characterized by the "boys' club" culture ratified by the NHL, and disparate treatment in the terms and conditions of her employment, including by targeting and punishing her—through pretextual termination—for reporting sexual harassment.

125.   Defendant Distler, in her capacity as Chief Human Resources Officer, aided, abetted, incited, compelled, or coerced the discriminatory conduct by fabricating a criminal accusation of "hacking" to justify the termination of a female employee who had engaged in protected activity, thereby treating her less well than male employees who were not subjected to false criminal accusations for performing assigned IT tasks.

126.   As a direct and proximate result of Defendants' unlawful conduct, Harris has suffered and continues to suffer economic damages, severe mental anguish, and reputational harm.

**SECOND CAUSE OF ACTION**
**Retaliation**
**in Violation of the New York City Human Rights Law**
**(NHL, NHL Enterprises, LP, Does 1–10, and Patrice Distler)**

127.    Harris incorporates the prior paragraphs.

128.    At all relevant times, Harris was an "employee" and Defendants were "employers" within the meaning of the NYCHRL, NYC Admin. Code § 8-107.

129.    Harris engaged in protected activity by participating as a witness in a confidential arbitration about sexual harassment and by reporting her own harassment to Human Resources at the Anaheim Ducks and OCSE.

130.    Defendants took adverse employment actions against Harris that would dissuade a reasonable worker from making or supporting a charge of discrimination. These actions included terminating her employment at the NHL based on a pretextual accusation of "hacking" and conspiring to blacklist her from the professional hockey industry.

131.    A causal connection exists between Harris's protected activity and the adverse actions, evidenced by the temporal proximity of her termination to her hiring at the NHL and the specific communications between the Ducks and the NHL about her protected status during and after her employment with the NHL.

132.    Defendants' unlawful retaliation constitutes bad faith, malicious, willful, and wanton violations of the law for which Harris is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**Aiding and Abetting Retaliation**
**in Violation of the New York City Human Rights Law**
**(Anaheim Ducks, OCSE, Does 1–10, and Marni Bobich)**

133.    Harris incorporates the prior paragraphs.

134.    At all relevant times, Harris was an "employee" and Defendants were "employers" within the meaning of the NYCHRL, NYC Admin. Code § 8-107.

135.    Harris engaged in protected activity by participating as a witness in a confidential arbitration about sexual harassment and by reporting her own harassment to Human Resources at the Anaheim Ducks and OCSE.

136.    Defendants took adverse employment actions against Harris that would dissuade a reasonable worker from making or supporting a charge of discrimination. These actions included threats to her career ("look elsewhere"), increasing her workload without compensation, promoting her harasser, interfering with her employment in New York, colluding with the NHL, NHL Enterprises, LP, and Patrice Distler to terminate her employment at the NHL based on a pretextual accusation of "hacking," and conspiring with the NHL, NHL Enterprises, LP, and Distler to blacklist her from the professional hockey industry.

137.    A causal connection exists between Harris's protected activity and the adverse actions, evidenced by the temporal proximity of her termination to her hiring at the NHL and the specific communications between the Ducks and the NHL about her protected status during and after her employment with the NHL.

138.    Defendants' unlawful retaliation constitutes bad faith, malicious, willful, and wanton violations of the law for which Harris is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**Discrimination and Sexual Harassment**
**in Violation of the New York State Human Rights Law**
**(Against NHL, NHL Enterprises, LP, Patrice Distler, and Does 1–10)**

139.    Harris incorporates the prior paragraphs.

140.    At all relevant times, Harris was an "employee" within the meaning of the NYSHRL and Defendants were "employers."

141.    Defendants subjected Harris to inferior terms of employment based on gender.

142.    Defendants subjected Harris to a hostile work environment characterized by the "boys' club" culture ratified by the NHL, and disparate treatment in the terms and conditions of her employment, including by targeting and punishing her—through pretextual termination—for reporting sexual harassment.

143.    Defendant Distler, in her capacity as Chief Human Resources Officer, aided, abetted, incited, compelled, or coerced the discriminatory conduct by fabricating a criminal accusation of "hacking" to justify the termination of a female employee who had engaged in protected activity, thereby treating her less well than male employees who were not subjected to false criminal accusations for performing assigned IT tasks.

144.    As a direct and proximate result of Defendants' unlawful conduct, Harris has suffered and continues to suffer economic damages, severe mental anguish, and reputational harm.

**FIFTH CAUSE OF ACTION**
**Retaliation**
**in Violation of the New York State Human Rights Law**
**(NHL, NHL Enterprises, LP, Does 1–10, and Patrice Distler s)**

145.    Harris incorporates the prior paragraphs.

146.    At all relevant times, Harris was an "eligible employee" within the meaning of the NYSHRL, and Defendants were "covered employers."

147.    By the actions described above, the NHL and Patrice Distler retaliated against Harris when they punished her for making protected complaints of sexual harassment, including by manufacturing a lie as pretext for firing her and colluding with OCSE, the Ducks, and Marni Bobich to blacklist her from professional hockey.

148.    As a direct and proximate result of Defendants' unlawful actions in violation of the NYSHRL, Harris suffered and continues suffering harm for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

149.    The Defendants' retaliation constitutes bad faith, malicious, willful, and wanton violations of the NYSHRL for which Harris is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**Aiding and Abetting Retaliation**
**in Violation of the New York State Human Rights Law**
**(Anaheim Ducks, OCSE, Does 1–10, and Marni Bobich)**

150.    Harris incorporates the prior paragraphs.

151.    At all relevant times, Harris "eligible employee" within the meaning of the NYSHRL, and Defendants were "covered employers."

152.    By the actions described above, the Ducks, OCSE, and Bobich retaliated against Harris when they punished her for making protected complaints of sexual harassment, including by colluding with the NHL, NHL Enterprises, LP, and Patrice Distler to manufacture a lie as pretext for firing her and to blacklist her from professional hockey.

153.    As a direct and proximate result of Defendants' unlawful actions in violation of the NYSHRL, Harris suffered and continues suffering harm for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

154.    The Defendants' retaliation constitutes bad faith, malicious, willful, and wanton violations of the NYSHRL for which Harris is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**Discrimination**
**in Violation of the California Fair Employment and Housing Act**
**(Anaheim Ducks and OCSE)**

155.     Harris incorporates the prior paragraphs.

156.     At all times relevant, Harris was an employee of Defendants Anaheim Ducks and OCSE under the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900 et seq.

157.     Defendants discriminated against Harris in the terms, conditions, and privileges of her employment based on her sex and gender. This discrimination included disparate treatment, denial of access to work areas, and the imposition of a hostile work environment.

158.     By the actions described above, OCSE and the Ducks discriminated against, harassed, and retaliated against Harris when they subjected Harris to repeated nonconsensual, sexual touching and vulgar, sexist, and derogatory comments, including about women and sex, and about Harris, her body, her clothing, and her sexual history; spread lies and rumors about Harris, her sexuality, and her sexual relationships; forced Harris to disclose intimate details of her sexual history; denied Harris entry to areas she was credentialed to access; failed to discipline Harris's harassers or otherwise remedy the discrimination and harassment; required Harris to report the discrimination and harassment she witnessed and experienced and then retaliated against her for reporting, including by increasing her workload, forcing her to quit, smearing her to the NHL, and colluding to blacklist Harris from any careers in professional sports.

159.     Harris's gender was a substantial motivating factor in Defendants' adverse employment actions, including the constructive discharge and the later interference with her employment at the NHL.

160.    As a direct and proximate result of Defendants' unlawful actions in violation of FEHA, Harris suffered and continues suffering harm for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

161.    Defendants' unlawful discrimination constitutes bad faith, malicious, willful, and wanton violations of the law for which Harris is entitled to an award of punitive damages.

**EIGHTH CAUSE OF ACTION**
**Sexual Harassment**
**in Violation of the California Fair Employment and Housing Act**
**(Anaheim Ducks, OCSE, and Marni Bobich)**

162.    Harris incorporates the prior paragraphs.

163.    At all times relevant, Harris was an employee of Defendants Anaheim Ducks and OCSE under the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900 et seq.

164.    By the actions described above, the Ducks, OCSE, and Bobich discriminated against, harassed, and retaliated against Harris when they subjected Harris to repeated nonconsensual, sexual touching and vulgar, sexist, and derogatory comments, including about women and sex, and about Harris, her body, her clothing, and her sexual history; spread lies and rumors about Harris, her sexuality, and her sexual relationships; forced Harris to disclose intimate details of her sexual history; denied Harris entry, on the basis of sex, to areas she was credentialed to access; failed to discipline Harris's harassers or otherwise remedy the discrimination and harassment; required Harris to report the discrimination and harassment she witnessed and experienced and then retaliated against her for reporting, including by increasing her workload, forcing her to quit, smearing her to the NHL, and colluding to blacklist Harris from any careers in professional sports.

165.    The harassment was sufficiently severe or pervasive to alter the conditions of Harris's employment and create an abusive work environment.

166.    Defendants failed to take immediate and appropriate corrective action despite having knowledge of the harassment, instead promoting the harasser.

167.    As a direct and proximate result of Defendants' unlawful actions in violation of FEHA, Harris suffered and continues suffering harm for which she is entitled to an award

of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

168.    Defendants' unlawful discrimination, harassment, and retaliation constitute bad faith, malicious, willful, and wanton violations of the California Fair Employment and Housing Act for which Harris is entitled to an award of punitive damages.

## NINTH CAUSE OF ACTION
### Retaliation
### in Violation of the California Fair Employment and Housing Act
### (Anaheim Ducks and OCSE)

169.    Harris incorporates the prior paragraphs.

170.    Harris engaged in protected activity under FEHA by participating as a witness in a sexual harassment proceeding and reporting her own harassment.

171.    Defendants took adverse employment actions against Harris, including constructive discharge and post-employment retaliation (blacklisting), which are prohibited by FEHA.

172.    Defendants' retaliatory animus is evidenced by the statement of HR Vice President Marni Bobich telling Harris to "look elsewhere" if she wanted a career in the industry.

173.    As a direct and proximate result of Defendants' unlawful actions in violation of the California Fair Employment and Housing Act, Harris suffered and continues suffering harm for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

174.    Defendants' unlawful discrimination, harassment, and retaliation constitute bad faith, malicious, willful, and wanton violations of the California Fair Employment and Housing Act for which Harris is entitled to an award of punitive damages

.

**TENTH CAUSE OF ACTION**
**Failure to Prevent Discrimination and Harassment**
**in Violation of the California Fair Employment and Housing Act**
**(Against Anaheim Ducks, OCSE, and Marni Bobich)**

175.    Harris incorporates the prior paragraphs.

176.    Defendants Anaheim Ducks, OCSE, and Marni Bobich had a legal duty to take all reasonable steps to prevent discrimination and harassment from occurring.

177.    Defendants failed to take such steps, as shown by their failure to discipline Nick Aguilera, their failure to enforce policies about workplace pornography, and their failure to investigate Harris's complaints impartially.

178.    As a direct and proximate result of Defendants' failure, Harris was subjected to discrimination, harassment, and retaliation.

179.    Harris has suffered and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted under the law.

**ELEVENTH CAUSE OF ACTION**
**Whistleblower Retaliation**
**in Violation of Cal. Lab. Code § 1102.5**
**(Against Anaheim Ducks, OCSE, Does 1–10, and Marni Bobich)**

180.    Harris incorporates the prior paragraphs.

181.    Harris had reasonable cause to believe that Defendants were violating state and federal laws regarding sexual harassment and workplace safety and disclosed this information to persons with authority over her.

182.    Defendants retaliated against Harris for this disclosure by constructively discharging her and effectively blacklisting her from future employment in the industry.

183.    California Labor Code § 1102.5(b) prohibits retaliation against an employee who discloses information the employee has reasonable cause to believe discloses a violation of a state or federal statute.

184.    As a direct and proximate result of Defendants' retaliatory conduct, Harris has suffered and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted under the law.

## TWELFTH CAUSE OF ACTION
### Whistleblower Retaliation
### in Violation of N.Y. Lab. Law § 740
### (Against All Defendants)

185.    Harris incorporates the prior paragraphs.

186.    Harris had reasonable cause to believe that Defendants were violating state and federal laws regarding sexual harassment and workplace safety and disclosed this information to persons with authority over her.

187.    Defendants retaliated against Harris for this disclosure by conspiring to blacklist her from future employment in the industry and in New York, and terminate her employment from the league's front office.

188.    As a direct and proximate result of Defendants' retaliatory conduct, Harris has suffered and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted under the law.

**THIRTEENTH CAUSE OF ACTION**
**Defamation Per Quod**
**(Against NHL, NHL Enterprises, LP, Patrice Distler, and Does 1–10)**

189.    Harris incorporates the prior paragraphs.

190.    Defendants made a false statement of fact to third parties (NHL management, security personnel, and future employers) concerning Harris, stating that Harris hacked her email account when they knew that to be false.

191.    This statement was published with the requisite degree of fault and malice, as Defendants knew Harris was assigned work on a ticket to fix the email account in question.

192.    As a direct result of this statement, Harris suffered special damages in the form of the loss of her specific employment with the NHL and the loss of prospective employment opportunities in the professional sports industry.

## FOURTEENTH CAUSE OF ACTION
### Defamation Per Se
**(Against NHL, NHL Enterprises, LP, Patrice Distler, and Does 1–10)**

193.    Harris incorporates the prior paragraphs.

194.    The statement that Harris hacked Defendant Distler's email constitutes defamation *per se* under New York common law because it: (a) Charges Harris with a serious crime (unauthorized use of a computer/computer trespass under NY Penal Law § 156.05 and § 156.10, and violation of the CFAA) and (b) tends to injure Harris in her trade, business, or profession as an IT Analyst, where data security and integrity are paramount.

195.    This statement was published with the requisite degree of fault and common law malice and actual malice, as Defendants knew Harris was assigned a ticket to fix the email account in question; therefore, no qualified privilege applies.

196.    As a direct result of this statement, Harris suffered presumed special damages.

## FIFTEENTH CAUSE OF ACTION
### Illegal Conspiracy
### in Violation of Section 1 of the Sherman Antitrust Act
### (All Defendants)

197.    Harris incorporates the prior paragraphs.

198.    Defendants NHL, Anaheim Ducks, and OCSE are distinct economic entities that compete for labor in the market for professional sports front-office and IT personnel.

199.    Defendants entered an illegal contract, combination, or conspiracy to restrain trade by agreeing to blacklist and boycott Harris, preventing her from obtaining employment within the NHL or its member franchises.

200.    This agreement constitutes a "group boycott" or concerted refusal to deal, a per se violation of the Sherman Act, or alternatively, constitutes an unreasonable restraint of trade under the Rule of Reason.

201.    Harris has suffered "antitrust injury" as her exclusion from the market was the direct result of the anticompetitive nature of the agreement to suppress competition for labor and punish whistleblowers, conduct the antitrust laws were intended to prevent.

202.    Harris is entitled to treble damages and any other damages permitted under law.

## SIXTEENTH CAUSE OF ACTION
### Blacklisting
### in Violation of California Business & Professions Code § 16600
### (All Defendants)

203. Harris incorporates the prior paragraphs.

204. California Business & Professions Code § 16600 declares that every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.

205. Defendants entered an illegal contract, combination, or conspiracy to restrain trade by agreeing to blacklist and boycott Harris, preventing her from obtaining employment within the NHL or its member franchises.

206. Defendants' conspiracy to blacklist Harris functions as a de facto non-compete agreement, restraining her from engaging in her lawful profession as an IT analyst in the sports industry.

207. This restraint is void as a matter of law and public policy in California, and Defendants' enforcement of this blacklist constitutes unfair competition.

208. Harris is entitled to all damages permitted under law.

**SEVENTEENTH CAUSE OF ACTION**
**Violations of the Cartwright Act (Cal. Bus. & Prof. Code § 16700 et seq.)**
**(All Defendants)**

209.    Harris incorporates the prior paragraphs.

210.    Defendants formed a trust or conspiracy to restrict commerce and prevent competition in the labor market for skilled sports industry professionals.

211.    The agreement to blacklist Harris and prevent her employment constitutes a concerted refusal to deal and a conspiracy to restrain trade in violation of the Cartwright Act.

212.    As a direct result of this unlawful conspiracy, Harris has been injured in her business and property by being excluded from the labor market.

213.    Harris is entitled to all damages permitted under law.

## EIGHTEENTH CAUSE OF ACTION
### Violations of the Donnelly Act (NY Gen. Bus. Law § 340)
### (All Defendants)

214. Harris incorporates the prior paragraphs.

215. Defendants engaged in a contract, agreement, arrangement, or combination whereby Harris was unlawfully excluded from the labor market in New York and beyond.

216. This conduct violates the Donnelly Act, which prohibits agreements that restrain the free exercise of any activity in the conduct of any business, trade, or commerce.

217. The blacklisting of Harris serves no legitimate business purpose and is designed solely to punish her for protected activity and enforce a code of silence regarding sexual harassment.

218. As a direct result of this unlawful conspiracy, Harris has been injured in her business and property by being excluded from the labor market.

219. Harris is entitled to all damages permitted under law, including trebled damages.

## NINETEENTH CAUSE OF ACTION
### Retaliation and Discrimination
### in Violation of the Federal Equal Pay Act (29 U.S.C. § 215)
### (Against Anaheim Ducks & OCSE)

220.     Harris incorporates the prior paragraphs.

221.     Defendants discriminated against Harris by paying her less than male employees for equal work on jobs the performance of which requires equal skill, effort, and responsibility.

222.     Harris engaged in protected activity by asserting her rights and opposing the discriminatory pay and treatment.

223.     Defendants retaliated against Harris for such opposition by constructively discharging her and blacklisting her, in violation of 29 U.S.C. § 215(a)(3).

224.     Defendants' actions were willful.

225.     Harris is entitled to all damages permitted under law.

**TWENTIETH CAUSE OF ACTION**
**Retaliation and Discrimination**
**in Violation of the California Equal Pay Act**
**(Against Anaheim Ducks & OCSE)**

226.    Harris incorporates the prior paragraphs.

227.    Defendants paid Harris less than employees of the opposite sex for substantially similar work.

228.    Defendants retaliated against Harris for invoking her rights under the Act by discharging her and taking adverse actions to prevent her re-employment, in violation of Cal. Labor Code § 1197.5(k).

229.    Defendants retaliated against Harris for such opposition by constructively discharging her and blacklisting her, in violation of 29 U.S.C. § 215(a)(3).

230.    Harris is entitled to all damages permitted under law.

**TWENTY-FIRST CAUSE OF ACTION**
**Tortious Interference with Prospective Economic Advantage**
**(All Defendants)**

231.    Harris incorporates the prior paragraphs.

232.    Harris had a business relationship with the NHL and a reasonable expectation of future economic advantage from that employment.

233.    Defendants Anaheim Ducks and OCSE knew of this relationship.

234.    Defendants intentionally interfered with this relationship by "wrongful means," specifically by communicating derogatory or false statements to the NHL and other professional sports organizations about Harris and by violating statutory anti-blacklisting laws.

235.    This interference caused the NHL to terminate Harris, resulting in damages.

236.    Harris is entitled to all damages permitted under law.

**TWENTY-SECOND CAUSE OF ACTION**
**Blacklisting**
**in Violation of Cal. Lab. Code § 1050**
**(Against Anaheim Ducks, OCSE, Marni Bobich, and Does 1–10)**

237.    Harris incorporates the prior paragraphs.

238.    Defendants, after Harris was constructively discharged from their service, by misrepresentation, prevented or attempted to prevent Harris from obtaining or continuing employment at the NHL and elsewhere in the industry.

239.    Defendants engaged in this conduct knowingly and with the intent to prevent Harris from obtaining employment.

240.    Defendants intentionally interfered with this relationship by "wrongful means," specifically by communicating statements to the NHL about Harris (labeling her a "whistleblower," "complainer," or similar) and by violating statutory anti-blacklisting laws.

241.    This interference caused the NHL to terminate Harris, resulting in damages.

242.    Harris is entitled to all damages permitted under law, including trebled damages.

**TWENTY-THIRD CAUSE OF ACTION**
**Discrimination and Harassment**
**in Violation of Title VII**
**(Against All Entity Defendants)**

243.    Harris incorporates the prior paragraphs.

244.    At all relevant times, Harris was an "employee" and Defendants were "employers" within the meaning of Title VII.

245.    By the actions described above, Defendants the Ducks and OCSE discriminated against and harassed Harris when they subjected Harris to repeated nonconsensual, sexual touching and vulgar, sexist, and derogatory comments, including about women and sex, and about Harris, her body, her clothing, and her sexual history; spread lies and rumors about Harris, her sexuality, and her sexual relationships; forced Harris to disclose intimate details of her sexual history; denied Harris entry, on the basis of sex, to areas she was credentialed to access; failed to discipline Harris's harassers or otherwise remedy the discrimination and harassment; required Harris to report the discrimination and harassment she witnessed and experienced and then retaliated against her for reporting, including by increasing her workload, forcing her to quit, smearing her to the NHL, and colluding to blacklist Harris from any careers in professional sports.

246.    Defendant NHL discriminated against and harassed Harris when they subjected her to a hostile work environment characterized by the "boys' club" culture ratified by the NHL and disparate treatment in the terms and conditions of her employment, culminating in her pretextual termination.

247.    As a direct and proximate result of Defendants' unlawful conduct in violation of Title VII, Harris suffered and continues suffering harm for which she is entitled to an

award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

248.   Defendants' unlawful discrimination and harassment constitute bad faith malicious, willful, and wanton violations of Title VII for which Harris is entitled to an award of punitive damages.

**TWENTY-FOURTH CAUSE OF ACTION**
**Retaliation**
**in Violation of Title VII**
**(Against All Entity Defendants)**

249.    Harris incorporates the prior paragraphs.

250.    At all relevant times, Harris was an "employee" and Defendants were "employers" within the meaning of Title VII.

251.    By the actions described above, Defendants the Ducks and OCSE retaliated against Harris when they punished her for making protected complaints of sexual harassment, including by increasing her workload, forcing her to quit, smearing her to the NHL, and colluding to blacklist her from any careers in professional sports.

252.    By the actions described above, Defendant the NHL retaliated against Harris when it punished her for making protected complaints of sexual harassment, including by manufacturing a lie as pretext for firing her and colluding with OCSE and the Ducks to blacklist her from professional hockey.

253.    As a direct and proximate result of Defendants' unlawful conduct in violation of Title VII, Harris suffered and continues suffering harm for which she is entitled to an award of damages, to the greatest extent permitted under law, along with attorneys' fees and expenses.

254.    Defendants' unlawful discrimination and harassment constitute bad faith malicious, willful, and wanton violations of Title VII for which Harris is entitled to an award of punitive damages.

## <u>PRAYER FOR RELIEF</u>

Harris demands judgment against Defendants in an amount to be determined at trial for the following relief:

A.    a declaration that the actions, conduct, and practices of Defendants violated federal, state, and city laws;

B.    an award of economic damages;

C.    an award of treble damages;

D.    an award of compensatory damages;

E.    an award of monetary damages for mental anguish and emotional distress;

F.    an award of punitive damages;

G.    an award of such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

H.    an award of reasonable attorneys' fees, costs, and expenses of this action;

I.    permanent equitable and injunctive relief; and

J.    any other relief that the Court deems just.

## JURY DEMAND

Harris demands a jury trial.

March 16, 2026                                      **SEPPINNI LAW, PLLC**
New York, NY

                                                    */s/ Shane Seppinni*
                                                    Shane Seppinni
                                                    Megan Jones
                                                    40 Broad St., 7th Fl.
                                                    New York, NY 10004
                                                    (212) 859-5085
                                                    shane@seppinnilaw.com
                                                    megan@seppinnilaw.com